UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Luanne E. Loraas,

Plaintiff,

vs.

Leslie M. Metzen,
Patrice K. Sutherland,
State of Minnesota,
Dakota County,
Robert Galvin,
Patrick T. Skelly,
Paul A. Jeddeloh,
Ferdinand F. Peters,
The Law Offices of Peters, Jeddeloh & Skelly, LLP,
Shirley A. Reider,

Defendants.

Case File No.: 00-1237 JRT/FLN

**REPORT AND RECOMMENDATION**

---

Plaintiff, pro se.
Kari Jo Ferguson for State of Minnesota and Judges Metzen and Sutherland.
Charles Lundberg for Robert Galvin.
Richard Thomas for Defendants Skelly, Jeddeloh, Peters, Reider, and The Law Offices of Peters, Jeddeloh & Skelly, LLP.
Andrea G. White for Dakota County.

---

**THIS MATTER** came before the undersigned United States Magistrate Judge on August 11, 2000, December 1, 2000, and January 12, 2001, on the Defendants' Motions to Dismiss and/or for Summary Judgment [##5, 12, 23, 30, 32], Plaintiff's Motions for Default Judgment [##41, 43], and Defendant Attorneys' Motion to Extend Time to File Motion to Dismiss [#56].



FILED FEB 1 5 2001
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD
DEPUTY CLERK

## I. BACKGROUND

### A. Introduction

In July, 1997, Plaintiff Luanne Loraas ("Loraas"), an attorney, was retained to represent Deborah Galvin, the wife of Defendant Robert Galvin, in a divorce proceeding. (Complaint, ¶ 16). The divorce was venued in Dakota County District Court in the State of Minnesota. (Id.). Robert Galvin was represented by Defendant Patrick Skelly ("Skelly"), Defendant Paul Jeddeloh ("Jeddeloh"), and the Defendant Law Offices of Peters, Jeddeloh & Skelly, LLP. (Id.). Various portions of the divorce proceeding and subsequent sanctions proceeding were presided over by Defendants Patrice Sutherland and Leslie Metzen, judges of the State of Minnesota's First Judicial District, who are employed by Defendant State of Minnesota. Defendant Shirley Reider was retained to represent Defendant Skelly after it became clear that Skelly might become a witness in the fees proceeding.

In this action, Plaintiff alleges that all Defendants have engaged in malicious prosecution and intentional infliction of emotional distress (Complaint, ¶ 139, ¶ 162), and that all Defendants other than the State of Minnesota have conspired to deprive her of her civil rights in violation of 42 U.S.C. § 1983. (Complaint, ¶ 86). Furthermore, Defendants Skelly, Jeddeloh, Peters, Reider, and the Law Offices of Peters, Jeddeloh & Skelly, LLP (collectively "Defendant attorneys") and Defendant Galvin are alleged to have engaged in abuse of process (Complaint, ¶ 133). Lastly, Defendant Skelly individually is alleged to have engaged in tortious interference with contract and prospective relations, fraud, and violation of Minn. Stat. §§ 481.07 and 481.071. (Complaint, ¶¶ 145, 153, 160). Plaintiff claims that these alleged violations warrant an award of punitive damages. (Complaint, ¶ 167).

## B. The Galvin Divorce Case

### 1. Before the Trial

Most of the claims in this case arise from interactions between Loraas and Skelly, between whom tension existed almost from the inception of the Galvin divorce trial. This tension is best revealed by some of Plaintiff's allegations regarding Skelly's treatment of her, allegations which form the basis for many of Plaintiff's legal claims. At a December 8, 1997, hearing before Judge Michael Sovis, Skelly said that the action was "very jilted" and "kind of silly," made negative references about Loraas' emotional state, and stated that Plaintiff's discovery requests were ridiculous. (Complaint, ¶ 104). In an April 21, 1998, Memorandum of Law, Skelly made additional negative comments about Plaintiff, including that: Plaintiff had no legal acumen, no common sense, a "unique disdain for communications," and that when she did communicate her communications were "essentially meaningless." (Id.).

Plaintiff also alleges that Skelly yelled at her in the chambers of Judge Simonett of the Dakota County District Court on May 1, 1998. (Id.). While in the presence of Deborah Galvin and Judge Simonett, Skelly referred to Plaintiff as "just plain outrageous" and shouted "fine, we will waste everybody's time and money!" (Id.). Skelly was not admonished by Judge Simonett for these actions, although he was repeatedly instructed not to yell. (Id.).

Plaintiff alleges that Skelly further harassed her prior to a telephone conference on May 13, 1998, by informing her that he was going to come over to her office and then standing outside of her office door. (Loraas Responsive Aff. at 20).

Skelly requested sanctions against Loraas on May 13 and May 14, 1998. (Loraas Responsive Aff. at 7). Plaintiff alleges that because the May 14, 1998, argument did not cite any

legal authority, it could only have been intended to harass and intimidate Lorass and Deborah Galvin before the trial. (Id. at 8). The requests for sanctions were denied. (Id.).

In addition to Skelly's actions, Plaintiff alleges that Judge Spicer of the Dakota County District Court discriminated against her in pretrial proceedings. During one meeting with Plaintiff and Skelly, Judge Spicer looked at Plaintiff oddly, smirked at her, and made a comment solely to Skelly which made Skelly laugh. (See Complaint ¶ 104(b)(ii)). After Plaintiff stated that she felt that she was being discriminated against on account of her gender, Judge Spicer met with Plaintiff alone, and then threateningly asked her if she knew what was going on. (Id.). At the conclusion of the meeting, Plaintiff bent over to retrieve her file cart and Judge Spicer stated, "That's a real nice thing you have there." (Id.). Plaintiff alleges that this was an inappropriate sexual comment. (Id.). Plaintiff further alleges that Judge Spicer made additional insulting and/or sexual commentary after he spoke to her privately. (Id.).

The other significant event in the pretrial phase of the Galvin divorce is Plaintiff's interest in developing evidence regarding Robert Galvin's alleged ownership of black walnut trees. Plaintiff's alleged basis for this line of inquiry is that Galvin's resume states that he enjoys "picking black walnut" and that he worked for a furniture restoration business that may have used black walnut in its work. (Loraas Responsive Affidavit at 14). Plaintiff alleges that Skelly rescheduled Robert Galvin's deposition for two hours after the original starting time in an attempt to forestall inquiry into the existence of the trees. (Id. at 11). Plaintiff also alleges that Skelly and Galvin attempted to conceal information about the alleged trees by concealing checkbook data and refusing to answer interrogatories about the value of the trees. (Id. at 11-13). The record fails to indicate whether Galvin actually does own any black walnut trees.

**2. The Trial**

The Galvin divorce was tried in Dakota County District Court during May, 1998. During the trial, on May 21, Judge Patrice K. Sutherland held a hearing regarding the provision of financial documents which was attended by Loraas and Skelly. (Exh. E to the Ascheman Affidavit at 346). The parties discussed procedures by which Robert Galvin could obtain various financial documents located in the home that he formerly shared with Deborah Galvin. (Id. at 347). Judge Sutherland ordered Skelly and Robert Galvin to travel to Deborah Galvin's home that evening and retrieve the documents. (Id. at 349).

Skelly and Robert Galvin acted as ordered. (Statement of Deborah Galvin, Exhibit F to the Ascheman Affidavit). Deborah Galvin's son and other members of her family were present at the home. (Id.). While Skelly was packing the files into his car, he informed Robert Galvin that he (Galvin) could attempt to negotiate a divorce settlement with Deborah Galvin but that Skelly could not participate, as Loraas was not then present. (Id.). Deborah Galvin overheard this remark and decided to ask Robert Galvin to negotiate. (Id.). Her statement indicates that she was motivated by Loraas' inability to appropriately represent her at the divorce trial or to "even take direction from the Judge that was trying to help her by guiding her." (Id.). After Robert Galvin agreed to negotiate, Deborah Galvin met with him on the patio. (Id.). At the same time, Skelly spoke with Deborah Galvin's son and brother. (Id.). Deborah Galvin's financial adviser came over to the house and analyzed the most recent settlement offer. (Id.). During this meeting, Deborah Galvin learned of another settlement offer made by Robert Galvin that Loraas had not forwarded to her. (Id.). After much negotiation, both sides agreed on a proposal which was substantially similar to a proposal made by Robert Galvin on December 4, 1997. (Id.).

Throughout the negotiations, Deborah Galvin remained in a separate room from Skelly. (Id.). At the conclusion of the meeting, Deborah Galvin's son telephoned Loraas and informed her that she was terminated as Deborah Galvin's attorney. (Id.). Loraas then brought a withdrawal document to Deborah Galvin's house for her to sign. (Id.). At the time the negotiation was concluded, Deborah Galvin believed that her divorce need not have gone to trial if Loraas had listened to her, and stated that Loraas was unwilling to make a counter proposal or to go over a proposal with Deborah Galvin's financial advisor. (Id.).

Loraas alleges that the document retrieval was ordered by Judge Sutherland to separate Loraas from her client so that Deborah Galvin could be influenced into settling the case. (Loraas Responsive Aff. at 41). Loraas also alleges that the file retrieval was an attempt by Skelly to intimidate Deborah Galvin. (Id. at 59).

At court the next day, Plaintiff's husband arrived at Defendant Sutherland's courtroom to serve Plaintiff's Notice of Withdrawal upon Plaintiff's former client and Defendant Skelly. (Complaint, ¶ 23). While in the courtroom, Plaintiff's husband saw Defendant Skelly speaking with Deborah Galvin about settlement of the case. (Complaint, ¶ 23).

Once the May 22, 1998, court session began, Skelly explained the terms of the settlement to Judge Sutherland. (Exhibit F to the Ascheman Affidavit). Deborah Galvin agreed to pay Robert Galvin $2,500 in attorneys' fees and to permit him to seek sanctions against Loraas. (Id. at 395). Although Plaintiff argues that the oral stipulation of May 22, 1998, does not permit Skelly to seek sanctions from Loraas, the transcript of the settlement hearing makes it clear that Skelly did in fact reserve that right. Compare Complaint, ¶ 25; Exhibit E to the Affidavit of Bryan G. Ascheman.

At the conclusion of the hearing, Judge Sutherland suggested to Deborah Galvin that she arbitrate Loraas' fees through the Dakota County Bar Association. (Complaint, ¶ 121(c)).

Plaintiff alleges that throughout the divorce trial, Dakota County judges permitted Skelly to continue his verbal abuse of Plaintiff by characterizing her as "non-communicative, emotional, ridiculous, absurd, mindless and irrational," and accusing her of having a "meltdown." (Complaint, ¶ 103(b)).

On June 18, 1998, Judge Sutherland entered an Order for Judgment following the terms of the agreement reached by the Galvins on May 21, 1998. (Exh. D to Ascheman Aff. at 3).

**C. The Sanctions Action Against Loraas**

After the Galvins settled their case, but prior to the entry of the Order for Judgment, Skelly went forward with his efforts to obtain sanctions from Loraas. On June 2, 1998, Loraas received a proposed Judgment and Decree and an affidavit from Skelly entitled "Affidavit in Support of Motion for Sanctions Against Luanne Loraas." (Complaint, ¶ 33). In the Affidavit, Skelly sought $18,000 in attorney's fees from Loraas, but did not identify the statute under which the fees were sought. (Id.). Loraas immediately objected to the Affidavit via letter to Judge Sutherland, an objection to which Judge Sutherland made no response. (Complaint, ¶¶ 34, 36).

On July 26, 1998, Loraas received a "Notice of Hearing" from Skelly stating that a hearing would take place on August 20, 1998, at which time Skelly would seek attorney's fees from Loraas. (Complaint, ¶ 41). No Notice of Motion or Motion accompanied the Notice of Hearing. (Id.). The Notice also failed to identify under which statute Galvin was seeking attorney's fees. (Id.).

Loraas retained an attorney, Phil Villaume, on July 28, 1998, to represent her in the fees proceeding. (Complaint, ¶ 42). Villaume moved to dismiss the attorney's fees proceeding for lack of due process and jurisdiction and moved in the alternative for an evidentiary hearing. (Id.). Villaume also moved to have Defendant Sutherland removed as the Judge in the evidentiary hearing since she was a potential witness. (Complaint, ¶ 43). Defendant Jeddeloh objected to Plaintiff's Motion in August, 1998. (Complaint, ¶ 44).

The August 20, 1998, hearing went forward. (Complaint, ¶ 45). On that morning, Defendant Galvin walked into the courtroom, brushed against the bench where Loraas was sitting, said "good morning" to her, and sat directly in front of her. (Id. at 23). Plaintiff alleges that these actions were designed to coerce her into paying the requested fees. (Id.).

Defendant Sutherland then told Plaintiff's attorney that she had predetermined that she would find against Plaintiff if Plaintiff went forward with the evidentiary hearing. (Complaint, ¶ 47). Plaintiff alleges Defendant Sutherland's bias and prejudgment of the case coerced her into submitting to Skelly's request to submit the matter to arbitration. (Complaint, ¶ 48). As a result, Plaintiff was potentially forced to pay arbitration fees and lost her right of appeal. (Id.).

The fees proceeding was referred to arbitration on August 21, 1998 under Minn. Stat. § 549.21. (Complaint, ¶ 54). As of that date, § 549.21 was no longer in effect. (Id.). Plaintiff's attorney informed the Court via letter on October 28, 1998, of this fact, writing that:

> Your order provides that the matter of sanctions is to be considered under Minnesota Statute Section 549.21. However, this statute was repealed effective October, 1997. Since that period of time, Minnesota Statutes Section 549.211 has been in effect. Attached is a copy of the repeal notice.
>
> *If you would correct your order of August 20, 1998, it would be greatly appreciated.* Thank you for your consideration. Patrick T. Skelly has been served a copy of this correspondence.

Exh. K to the Affidavit of Luanne E. Loraas (emphasis added); Complaint, ¶ 55. The record is clear, therefore, that Plaintiff was not only aware of a potential problem with the fees proceeding, but requested that action be taken to correct the problem.

On December 9, 1998, Defendant Reider, who had by now been retained by Skelly because of his potential role as a witness in the fees proceeding, wrote a letter to Defendant Sutherland and copied it to Skelly, Robert Galvin, and Villaume. (Exhibit M to the Affidavit of Luanne E. Loraas filed in opposition to the State's Motion to Dismiss). The letter noted Reider's support for submitting the case to a family law expert for independent review prior to submitting it to binding arbitration. (Id.). The letter also notes what Reider alleged to be Loraas' unethical actions in refusing to arbitrate fees with her former client and in filing an ethics complaint with the Minnesota Board of Professional Responsibility against Skelly regarding the subject matter that was intended to go to arbitration. (Id. at 2). Given the filing of Loraas' ethics complaint, Reider concluded that arbitration was inappropriate and that the matter should be heard in open court. (Id.). On her copy of the letter, Judge Sutherland noted: "Please file - Jennifer called her - suggested she set up conf. call w/Villaume and [O'Connor]. PKS." (Id. at 1).

As a result of this letter, Skelly's sanctions action was removed from arbitration and returned to the Dakota County District Court. On March 24, 1999, Defendant Reider informed Villaume that a court trial was scheduled for May 10, 1999. (Complaint, ¶ 64). Five days later, Villaume informed Reider and Sutherland that Plaintiff did not intend to participate in a fees proceeding where the fees were sought under a repealed statute. (Complaint, ¶ 65). In April, 1999, Sutherland informed Villaume that she was removing herself as the judge in the fees

matter and that she had issued an Amended Order on the fees issue which referred to Minn. Stat. § 549.211, the successor statute to the repealed § 549.21. (Complaint, ¶ 66).

In issuing the Amended Order, the Court replaced its original Order of August 21, 1998, which referred to Minn. Stat. § 549.21, with an Amended Order, also dated August 21, 1998, which referred to Minn. Stat. § 549.211. (Complaint, ¶ 68). Plaintiff's husband saw Valerie Blomquist, an employee of the Dakota County clerk's office, back date a file stamp to August 25, 1998, and stamp the Amended Order. (Id.).

Defendant Metzen presided over the fees proceeding on May 10, 1999. (Complaint, ¶ 70). Neither Robert Galvin nor Skelly appeared, although Defendant Reider was present. (Id.). At this proceeding, Reider acknowledged that the procedural posture of the fees proceeding was improper because Robert Galvin had not in fact brought a motion under Minn. Stat. § 549.211 for fees against Loraas. (Complaint, ¶ 71). Rather than issue a ruling at the proceeding, Metzen and Reider indicated that, at some future time, Robert Galvin would bring a motion for attorney's fees under Minn. Stat. § 549.211. (Complaint, ¶ 72). Metzen indicated that a trial date would be set and that discovery would take place after Galvin's Motion was brought. (Complaint, ¶ 72). The Court's Order of June 3, 1999, reflects these rulings. (Complaint, ¶ 73).

Initial steps were taken to hear the fees proceeding before John S. Connolly, a Ramsey County District Court judge. (Complaint, ¶¶ 77, 78). Shortly before the September 15, 1999, pre-trial date, however, the pre-trial hearing was cancelled. (Complaint, ¶ 79). Plaintiff's attorney learned on December 30, 1999, that Robert Galvin had decided to not pursue his fees proceeding any further. (Complaint, ¶ 81).

The record does not reflect any additional efforts to obtain fees from Loraas.

**D. The Instant Action**

**1. Service Upon Defendant Attorneys**

Loraas brought the instant action after the termination of efforts to obtain sanctions from her. The U.S. Marshals' Service mailed the Complaint to Defendant Attorneys on June 6, 2000. (Affidavit of Bryon G. Ascheman at 1). A pre-printed waiver form accompanied the Complaint which provided twenty days for Defendant Attorneys to respond to the Complaint if signed. (Id.). Recognizing that Federal Rule of Civil Procedure 4(b) provides sixty days to answer a Complaint in the event that a Defendant waives personal service, Defendant Attorneys refused to waive service. (Id.).

Rather than attempt personal service, the Marshals' Service mailed a second waiver request to Defendant Attorneys, which was received on July 24, 2000. (Id. at 2). At that time, Defendant Attorneys waived personal service, but noted in their waiver that they were doing so pursuant to the provisions of Fed.R.Civ.P. 4(b). (Id.; Exhibit E to the Ascheman Affidavit).

Defendant Attorneys then began to prepare a Rule 12 Motion to Dismiss. While preparing the Motion, Defendant Attorneys chose to follow Local Rule 7.1(b)(2), which establishes a briefing schedule for a dispositive motion when a party is represented by counsel. (Id. at 2). This rule was chosen over Local Rule 7.1(b)(1), which establishes a briefing schedule for pro se parties, because of Plaintiff's status as an attorney. (Id.). Accordingly, on September 22, 2000, sixty days after the waiver of personal service was signed by Defendant Attorneys, Plaintiff was served with the Rule 12 motion and supporting documentation. (Id.). A copy of the service letter accompanying that motion was not mailed to the Court. (Id. at 3).

Defendant Attorneys did not learn that Plaintiff intended to proceed under Local Rule 7.1(b)(1) until Plaintiff informed counsel for Defendant Galvin of that position after Defendant Attorneys' Motion was served. (Id.). After obtaining that information, Defendant Attorneys' Rule 12 Motion was filed with the Court in accordance with Local Rule 7.1(b)(1). (Id.).

### 2. Service Upon Defendant Galvin

Defendant Galvin's counsel filed and served a motion to dismiss under Rule 12 on July 26, 2000. (Affidavit of Charles E. Lundberg at 1). Like counsel for Defendant Attorneys, Galvin's counsel followed the service requirements of Local Rule 7.1(b)(2) requiring the exchange of dispositive motion papers prior to filing with the Court. (Id.). Galvin's supporting papers were served on September 5, 2000, but Galvin's counsel did not learn that Plaintiff intended to apply Local Rule 7.1(b)(1) until after October 6, 2000. (Id. at 1, 2). Acting on instructions from this Court, Galvin's counsel then filed an Amended Notice of Motion and Motion with a Court-supplied hearing date of December 1, 2000, and withdrew the Motion to Dismiss filed July 26, 2000. (Id.; Exhibit A to Supplemental Affidavit of Luanne E. Loraas).

## II. ANALYSIS

### A. Standard of Review

### 1. Motion to Dismiss

Defendants have moved for dismissal of Plaintiff's claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The court should not dismiss the complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Holloway v. Lockhart, 792 F.2d 760, 761-62 (8th Cir. 1986). In addition, the court "must presume that the factual

allegations of the complaint are true and accord all reasonable inferences from those facts to the non-moving party." Id.; see Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). Under Rule 12(b)(6), the court is not to rely on material outside the complaint unless it is to treat the motion as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

### 2. Motion for Summary Judgment

A court will grant summary judgment if the record presents no genuine issues of material fact when the facts are viewed in the light most favorable to the non-moving party. Rabushka, ex rel. United States v. Crane Co., 122 F.3d 559 (8th Cir. 1997). The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). Federal Rule of Civil Procedure 56(c) provides, in relevant part, that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A party opposing a motion for summary judgment "may not rest upon the allegations or denials of its pleadings; rather, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" Holowaty v. McDonald's Corp., 10 F.Supp.2d 1078, 1082 (D.Minn. 1998)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 256) and Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## B. Judges Metzen and Sutherland Are Entitled to Absolute Immunity from Damages

Judges Metzen and Sutherland seek dismissal and/or summary judgment on the premise that they are entitled to judicial immunity. Judicial immunity from damages for judicial conduct

applies even if that conduct is erroneous. Stump v. Sparkman, 435 U.S. 349, 355-57, 98 S.Ct. 1099, 1104-05 (1978). Immunity will only be abrogated if a judge is shown to act in the clear absence of all jurisdiction. Id. at 356-57, 98 S.Ct. at 1105. In determining whether an act is "judicial," the Court examines the nature of the act itself and the expectations of the parties. Id. An act is judicial if it is one that the judge would normally perform and if the parties dealt with the judge in his or her judicial capacity. Id. See also Mireles v. Waco, 502 U.S. 9, 13, 112 S.Ct. 286, 288 (1991). The definition of "judicial" in this context "should be broadly construed in favor of immunity." Adams v. McIlhany, 764 F.2d 294, 297 (5th Cir. 1985), cert. denied, 474 U.S. 1101 (1986). Judicial immunity applies "however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff." Cleavinger v. Saxner, 474 U.S. 193, 199-200, 106 S.Ct. 496, 500 (1985) (citation omitted). In particular, a judge presiding over a court of general jurisdiction does not act in the clear absence of all jurisdiction if the general subject matter is within the jurisdiction of the district court. See New Alaska Development Corp. v. Guetschow, 869 F.2d 1298, 1302 (9th Cir. 1989)(judicial immunity granted even if the court had no personal jurisdiction over plaintiff corporation because state court had general jurisdiction over divorce proceedings).

In contrast, judicial immunity may be waived where a judge engages in acts that deny an opportunity to appear in court, acts of personal involvement, and acts of coercion. Birch v. Mazander, 678 F.2d 754, 755 (8th Cir. 1982). Judicial acts taken in violation of clearly valid statutes or case law expressly depriving a judge of jurisdiction can also breach judicial immunity. Mills v. Killebrew, 765 F.2d 69, 71-72 (6th Cir. 1985).

The conduct by Defendants Metzen and Sutherland of which Plaintiff complains is clearly protected by judicial immunity because it consisted solely of authorized judicial acts. See Minn. Stat. § 484.01, subd. 1 (1996) (Minnesota district courts have "original jurisdiction in all civil actions within their respective districts"). Examination of each of the alleged bad acts in turn shows that they are judicial in nature.

Defendant Sutherland presided over portions of the divorce proceeding between the Galvins and issued two orders, an amended order, and the final divorce Judgment and Decree. (Affidavit of Judge Sutherland at 1). Judge Sutherland also presided over the initial stages of Galvin's attempt to obtain attorney's fees and sanctions from Loraas. (Id.). Defendant Metzen had even less to do with the divorce and sanctions proceeding than Defendant Sutherland, in that she signed a single order pertaining to Galvin's fees collection attempt. (Affidavit of Judge Metzen at 1). All of these actions are fundamentally judicial, and the defendant judges are entitled to immunity from their consequences.

Plaintiff takes particular exception to Defendant Sutherland's backdating of an amended order to refer to a non-existent motion under Minn. Stat. § 549.211 by Defendant Galvin. While the Court recognizes that back-dating an Amended Order is a somewhat unorthodox solution to the problem presented, any potential claim is waived by the fact that Plaintiff's own attorney requested the change.

Given that Judge Sutherland's judicial immunity should not be breached for back-dating an order, Judge Metzen's immunity should not be breached for her alleged failure to correct the situation.

Loraas also argues that Sutherland should lose her immunity to a charge of sexual harassment because she permitted Skelly to yell at her. This argument must fail. Even assuming that Skelly was in fact yelling, a judge's decision on how to run her courtroom is a fundamentally judicial decision that must be protected by judicial immunity.

Plaintiff also alleges that Judges Metzen and Sutherland were participants in a conspiracy designed to harm her. Even assuming that participation in a conspiracy is sufficient to deny a judge the protection of judicial immunity, there is no evidence in the record before the Court to support the conspiracy allegations. That Plaintiff disagreed with the actions of the judges does not mean that the judges were conspiring against her.[1]

The cases Plaintiff cites in support of her argument are readily distinguishable. For example, in Forrester v. White, 484 U.S. 219 (1988), a state court judge did not have absolute immunity for his administrative decision to demote a probation officer. In King v. Love, 766 F.2d 962, 968 (6th Cir.), cert. denied, 474 U.S. 971 (1985), a judge lost judicial immunity when he deliberately misled a police officer about the identity of a person sought on a search warrant. And in Zarcone v. Perry, 572 F.2d 1039 (2nd Cir. 1978), a judge lost immunity when he had a deputy sheriff arrest a coffee vendor for serving "putrid" coffee. These cases clearly show judges participating in non-judicial acts. As such, they are readily distinguishable from the actions ordered by Judges Metzen and Sutherland.

---

[1]Even if there was a conspiracy, substantial caselaw suggests that the defendant judges would still be entitled to judicial immunity. See, e.g., Isakson v. First Nat. Bank, Sioux Falls, 985 F.2d 984 (8th Cir. 1993)(judge absolutely immune despite allegation of conspiracy with private party to foreclose upon plaintiff's real property); Smith v. Bacon, 699 F.2d 434 (8th Cir. 1983)(judge absolutely immune despite allegation that state court judges conspired with public defenders to predetermine prisoner's post-conviction proceeding).